IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GURPREET S. PADDA, M.D. and INTERVENTIONAL CENTER FOR PAIN MANAGEMENT, P.C.<br><br>     Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA,<br>in his official capacity as Secretary of the United States Department of Health and Human Services,<br><br>and<br><br>LIZ RICHTER,<br>in her official capacity as Acting Administrator for the Centers for Medicare and Medicaid Services,<br><br>and<br><br>WISCONSIN    PHYSICIAN    SERVICE INSURANCE  CORPORATION  (d/b/a  WPS Government Health Administrators),<br><br>     Defendants. | Case No. _____<br><br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF** |

Plaintiffs Interventional Center For Pain Management, P.C. and Dr. Gurpreet S. Padda (collectively, "Dr. Padda" or "Plaintiffs") hereby apply to this Court for injunctive relief and, as grounds for this Complaint, state as follows:

## INTRODUCTION

1.      This is a civil action for a Temporary Restraining Order and Preliminary Injunction to prevent Defendants from putting Dr. Padda out of business based on a billing dispute and demand for overpayment.

2.      The billing dispute is premised entirely on a difference in clinical opinion used to overturn Dr. Padda's medical judgment.

3.      That difference in clinical opinion serves as the basis for Defendants' overpayment demand, which relies on a flawed and invalid statistical methodology to inflate $14,418.93 in alleged overpayments to an extrapolated alleged overpayment of more than $5,964,295, a 39,934% increase.

4.      The medical review and statistical sampling upon which this demand is based were conducted by a Medicare Zone Program Integrity Contractor ("ZPIC") and/or Unified Program Integrity Contractor ("UPIC") – commonly referred to as "bounty hunters" – who are paid a percentage of the amount their audits determine to have been noncompliant with Medicare regulations.  Individuals performing these audits undertake review of complex medical claims and are not identified by name or professional designation.  Despite Dr. Padda's medical training and full compliance with billing requirements, it does not appear that any physician participated in the ZPIC/UPICs' review that ultimately overruled his medical judgment.

5.      ZPIC/UPIC determinations are routinely reversed once providers reach the first level of impartial review – an Administrative Law Judge ("ALJ") hearing.  Defendants do not claim that the billing dispute is the result of any fraud or artifice on the part of Dr. Padda.

6.      Dr. Padda is entitled to prompt administrative and judicial review of the billing dispute.  Dr. Padda is highly likely to prevail on the issues underlying the billing dispute, including

the determination of medical necessity and the invalidity of the extrapolation process.  Indeed, even if Dr. Padda succeeds only in invalidating the purported statistical methodology used to extrapolate the overpayment (which contains a number of flaws), the demand would decrease from $5,964,295 to $14,418.93.

7.     Although Dr. Padda is engaged in Medicare's administrative appeal process and has requested urgent and immediate review, there is a backlog of claims pending before the Office of Medicare Hearings and Appeals ("OMHA").[1]  The current administrative backlog of claims pending before OMHA will preclude Dr. Padda from receiving his first unbiased review before an impartial ALJ for *at least* three to five years, which is far more than the 90 days required by law.[2] 42 U.S.C. § 1395ff(d)(1)(A); 42 C.F.R. § 405.1016(a).  While Dr. Padda awaits ALJ review, Defendants intend to invoke self-help to recoup 100% of $5,964,295 immediately from Dr. Padda's future Medicare payments.  Despite the lengthy backlog, recoupment is not stayed pending ALJ appeal.  42 C.F.R. §13955ddd(f)(2)(A).

8.     Recoupment of $5,964,295 will cause irreparable harm in the form of financial ruin, forced termination of employees, and certain closure of Dr. Padda's medical practice.  Dr. Padda will be unable to obtain meaningful relief at a post-recoupment hearing because, by that time, his practice will almost certainly be closed.  The Government's decision to invoke self-help and to recoup its alleged overpayment of nearly $6 million from Dr. Padda's future Medicare payments

---

[1] U.S. Dept. of Health & Human Serv., *Average Processing Time by Fiscal Year*, https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html (last visited March 20, 2021).

[2] *Id.*

without providing the prompt administrative appeal process demanded by federal law violates Dr. Padda's due process rights.

9.      To be clear, Dr. Padda is <u>not</u> asking this Court to usurp the power of the ALJ to decide any issue regarding the dispute at issue.  Instead, Dr. Padda simply seeks a temporary restraining order and preliminary injunction to preserve the status quo pending completion of the administrative appeal process.  In the absence of such relief, recoupment will proceed regardless of the lengthy backlog and delay that pervades the appeal process, causing Dr. Padda and his medical practice severe and irreparable harm.

10.     The Government should be enjoined from recouping the alleged overpayment until Dr. Padda receives full due process by exhausting the administrative review process, up to and including a hearing before an ALJ.

## PARTIES

11.     Dr. Padda is board-certified in anesthesiology, pain management, and addiction medicine.  He is the sole owner of Interventional Center For Pain Management, P.C., a medical practice located in St. Louis, Missouri.

12.     Dr. Padda participates in the Medicare program pursuant to a provider agreement with the Centers for Medicare and Medicaid Services ("CMS") and applicable federal statutes and regulations.

13.     CMS is part of the United States Department of Health and Human Services ("HHS"), an agency of the United States government.

14.     Defendant Xavier Becerra ("Secretary"), sued in his official capacity only, is Secretary of HHS and is responsible for administering the Social Security Act, 42 U.S.C. §§ 301, et seq., and in particular the Medicare Act, 42 U.S.C. §§ 1395, et seq.

15.     Defendant Liz Richter, sued in her official capacity only, is the acting Administrator for CMS (the "Administrator").

16.     Secretary Beccera has delegated to the Administrator substantial responsibility for administering the Medicare Act.

17.     Defendant Wisconsin Physician Service Insurance Corporation ("WPS") is a Medicare Administrative Contractor ("MAC") responsible for processing Medicare claims, making payments to Dr. Padda, and implementing directives to suspend or recoup Medicare payments.

## JURISDICTION AND VENUE

18.     Jurisdiction and venue are proper in this Court for the following reasons.

19.     This action arises under the Social Security Act, 42 U.S.C. §§ 301, et *seq.*, the Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, and the Fifth Amendment to the United States Constitution.

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1651 (All Writs Act), and under the Court's general equity powers.  Dr. Padda also is entitled to the judicial relief sought herein pursuant to the Administrative Procedure Act, 5 U.S.C. § 705.

21.     Dr. Padda participates in the Medicare program, and thus, submits bills and receives reimbursement for the treatment of patients covered by that program.  Under the Medicare Act and CMS regulations, 42 C.F.R. §§ 498.40(a) and 498.5(l)(2), Dr. Padda is entitled to an administrative appeal of the alleged overpayment determination and the accuracy of and decision to extrapolate the alleged overpayments.  However, there is no administrative mechanism for Dr. Padda to obtain a stay of the recoupment pending the outcome of his administrative appeal.  42 U.S.C. §

1395ddd(f)(2)(A).  Other than the relief requested herein, Dr. Padda has no other adequate remedy at law.

22.     Jurisdiction under 28 U.S.C. § 1331 is not defeated by the usual exhaustion of administrative remedies requirement under the Medicare Act because exhaustion is not required where it would mean "no review at all" or "the practical equivalent of a total denial of judicial review." *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19 (2000).

23.     Judicial review only after completion of the administrative appeal process is the practical equivalent of a complete denial of judicial review, as the administrative review will take three to five years and will not be completed until long after CMS's recoupment of the alleged $5,964,295 overpayment force Dr. Padda's medical practice to close.  If this court does not issue injunctive relief, Dr. Padda will have no review at all, will suffer irreparable harm, and his medical practice will close – any administrative remedies theoretically available will be too late and of no practical value.

24.     This Court has jurisdiction over this action under 42 U.S.C. § 405 pursuant to the "waiver" exception to the usual requirement of exhaustion of administrative remedies.  Exhaustion of administrative remedies under the Medicare Act is not required where the plaintiff's interest in having a particular issue resolved promptly is so great that the requirement is considered waived. Unless Dr. Padda's claim can be resolved promptly, his medical practice will close, and Dr. Padda will face financial ruin.  Accordingly, Dr. Padda's interest in having his claims resolved promptly is so great that the requirement should be considered waived.

25.     Dr. Padda's request for an injunction is collateral to the substantive claims that Dr. Padda is pursuing through the administrative appeal process.  Dr. Padda is not asking this Court to resolve the merits of the underlying dispute.  Instead, Dr. Padda merely requests that this Court

maintain the status quo and preclude Defendants from recouping $5,964,295 until Dr. Padda has been afforded the opportunity to appeal the dispute through the full administrative appeal process.

26.     Under the Mandamus Act, district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  This action is brought to compel the Secretary to perform duties owed to Dr. Padda, namely to direct CMS not to recoup or cause recoupment of alleged overpayments until Dr. Padda has been able to avail himself of the administrative appeal process, and thus provides an additional basis for jurisdiction.

27.     Under the Medicare Act and CMS regulations, 42 C.F.R. §§ 498.40(a) and 498.5(l)(2), Dr. Padda is clearly entitled to the opportunity for an administrative appeal, and Defendants have an affirmative duty to provide such an opportunity.  Thus, insofar as pre-hearing recoupment of over $5,964,295 will put Dr. Padda out of business, Dr. Padda has a clear right to an injunction prohibiting self-help recoupment until exhaustion of his administrative appeal rights.

28.     Mandamus jurisdiction under 28 U.S.C. § 1361 permits flexibility in remedy, including injunctive relief.  CMS' administrative remedies are incapable of affording full relief to Dr. Padda because they do not include either injunctive relief or any redress for the irreparable harm to Dr. Padda.

29.     This Court has jurisdiction under 5 U.S.C. § 705, as a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because the Plaintiffs are domiciled in this judicial district.

## MEDICARE PROGRAM REQUIREMENTS

**A.      The Medicare Payments and Review Process.**

31.      The United States reimburses Medicare providers with payments through its agency, CMS.  CMS, in turn, contracts with MACs to review, approve, and pay Medicare bills, called "claims," received from health care providers like Dr. Padda.  In practice, when medical providers furnish services to a Medicare beneficiary, the providers thereafter submit a claim for reimbursement to CMS, through a MAC. 42 U.S.C. § 1395ff(a)(2)(A).  MACs are government contractors responsible for processing Medicare claims and making payments.  42 U.S.C. § 1395kk-l(a)(3).

32.      The MAC covering Dr. Padda's Medicare reimbursement during the relevant time period was WPS.

33.      Some claims that are initially paid by MACs are then subjected to an additional level of oversight.  In a process known as "post-payment review," third-party contractors audit, and frequently reverse, MAC payment decisions.  The post-payment review process has imposed significant burdens on the claim appeals process.  The result of audits performed by a Medicare Zone Program Integrity Contractor ("ZPIC") and/or Unified Program Integrity Contractors ("UPIC"), are appealed through the Medicare claims appeals process.

34.      Even though the primary goal of ZPICs/UPICs is to investigate and deter instances of suspected fraud, absent such findings, ZPICs/UPICs also may identify improper payments that are then referred to the MAC to request recovery of any overpayment.  ZPICs/UPICs have engaged in wide-ranging audits that often question the medical judgment of providers, like Dr. Padda, based only on a review of the medical chart.

35.     Aggressive and widespread auditing activity by ZPICs/UPICs has predictably affected the number of provider appeals.[3]  In most circumstances, ZPICs use statistical sampling to calculate and project the amount of overpayments made on claims, which results in the findings from an audit of a small number of claims serving as the basis for a significantly larger overpayment amount.

36.     This aggressive auditing is compounded by the very use of ZPICs, who are paid a percentage of the amount their "audits" determine to have been noncompliant and who are tasked with reviewing complex medical claims seemingly with no professional clinical background.

**B.     The Significant Delay in Obtaining an ALJ Hearing.**

37.     The statutory time periods governing the appeals process provide for all levels of administrative review to be completed within about one year.  At the ALJ appeal level, the ALJ "shall conduct and conclude a hearing … and render a decision on such hearing by not later than the end of the 90-day period beginning on the date a request for hearing has been timely filed."  42 U.S.C. § 1395ff(d)(1)(A).  In practice, however, the time it takes to pursue an appeal through HHS far exceeds the timeframes established by the Medicare Act.[4]

---

[3] Creating A More Efficient and Level Playing Field: Audit and Appeals Issues in Medicare: Hearing before the Comm. on Fin., 114th Cong. 36 (2015) (Statement of Sandy Coston, CEO and President of Diversified Service Options, Inc., a Medicare Part A and Part B MAC) ("The backlog, as stated in my written testimony, was directly attributed to the implementation of the RAC contractors. With the method of their payment being dependent on their recoveries, it makes sense that the RAC reviewed the highest dollar claims where it was likely that the documentation would be insufficient…"), https://www.govinfo.gov/content/pkg/CHRG-114shrg20035/pdf/CHRG-114shrg20035.pdf (last accessed Mar. 29, 2021).

[4] U.S. Dept. of Health & Human Serv., *Average Processing Time by Fiscal Year*, https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html (last visited March 20, 2021).

38.     Enormous increases in the rates of appeal, in significant part from providers challenging inappropriate denials by over-zealous government contractors, have caused a massive backlog at the ALJ level of the appeals process.  OMHA reports that the average time for an appeal filed in fiscal year 2020 to be processed for an ALJ hearing is 1,430.1 days, which is nearly 4 years.[5]  The backlog is only worsening.  And the process for Dr. Padda's administrative appeal may take even longer than 4 years, as OMHA has also reported significant annual increases in average processing times for the last decade.[6]  As of November 2017, approximately 530,000 appeals were pending at OMHA[7]  and "OMHA still has 6 years of work on its hand for its current ALJs."[8]

39.     Despite these well-known lengthy delays, recoupment is not stayed pending ALJ appeal.  42 U.S.C. § 1395ddd(f)(2)(A).  In fact, CMS directs contractors like WPS to seek recoupment once the request for reconsideration is denied regardless of "whether or the provider subsequently appeals the overpayment to the ALJ, or subsequent levels."[9]

---

[5]     U.S. Dept. of Health & Human Serv., *Average Processing Time by Fiscal Year*, https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html (last visited March 20, 2021).

[6]     *Id.*

[7]     Chief Administrative Law Judge Nancy J. Griswold, *Office of Medicare Hearings and Appeals Fiscal Year 2019 Congressional Justification*, at 2*, available at* https://www.hhs.gov/sites/default/files/fy2019-office-of-medicare-hearings-and-appeals-accessible.pdf (last visited March 23, 2021).

[8]     *Id.* at 7.

[9]     Medicare Financial Management Manual (CMS Pub. 100-06), Ch.3 § 200, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/fin106c03.pdf (last visited Jan. 22, 2020).

## THE FACTS UNDERLYING THE BILLING DISPUTE

40.     By letters dated March 13, 2020, and April 23, 2020, CoventBridge Group ("CoventBridge"), a UPIC, requested medical records of 64 patients for dates of service only spanning for approximately 3 months.  The dates of service fell within the period between April 2016 and February 2020.

41.      CoventBridge reviewed just 55 claims out of a universe of 44,580 claims submitted – or approximately 0.1% of 44,580 claims submitted by Dr. Padda.

42.     By letter dated July 27, 2020, CoventBridge informed Dr. Padda of its determination of an alleged $14,418.93 overpayment and projected an extrapolated overpayment of $5,964,295 based on the sample of 55 claims reviewed.  Exhibit 1.

43.     CoventBridge's determination was based exclusively on a retroactive record review, without any communications with or input from Dr. Padda, who had actually evaluated and treated the patients.

44.     By letter dated August 17, 2020, WPS issued its initial request for Dr. Padda to pay $5,964,295. Exhibit 2.

45.     On September 15, 2020, pursuant to 42 C.F.R. § 450.940, Dr. Padda timely requested redetermination of the alleged overpayment.  Contrary to CoventBridge's and WPS' allegations, Dr. Padda's documentation demonstrated that services were medically necessary, and that Dr. Padda documented all required pre-procedural conservative therapies and assessments showing that the claims at issue were valid and supported.  Exhibit 3.

46.     By letter dated November 6, 2020, WPS issued an unfavorable redetermination decision.  Exhibit 4.

47.     On January 4, 2021, pursuant to 42 C.F.R. §405.960, Dr. Padda timely submitted a Request for Reconsideration.  Moreover, because it was evident that WPS did not fully review all of the documentation that Dr. Padda had previously provided to CoventBridge, Dr. Padda provided WPS a full copy of the supporting documentation previously provided to CoventBridge.  Exhibit 5.

48.     In support of the January 4, 2021, Request for Reconsideration, Dr. Padda produced examples, which were provided to WPS as exhibits, depicting the presence of the documentation that WPS and CoventBridge claimed were missing or insufficient.  The documented examples evidenced compliance and medical necessity for the services rendered.

49.     Dr. Padda also challenged the statistical sampling utilized to determine the overpayment and the statistical projection used to convert an alleged $14,418.93 overpayment into an extrapolated overpayment of $5,964,295 – which is a 39,934% increase.

50.     By letter dated March 12, 2021, C2C Innovative Solutions, Inc., a Qualified Independent Contractor ("QIC"), issued an unfavorable decision.  Exhibit 6.

51.     On December 19, 2019, pursuant to 42 C.F.R. § 405.1000, Dr. Padda timely submitted a request for an ALJ hearing to challenge all of the determinations, the sample size utilized, and the statistical methodology utilized for extrapolation.

## DR. PADDA IS LIKELY TO SUCCEED ON THE MERITS

52.     Dr. Padda is contesting the billing dispute underlying the impending recoupment through the administrative review process.  Dr. Padda is likely to prevail, in whole or in large part, once he presents his case to an ALJ, which will be his first opportunity to have the billing dispute heard by an impartial neutral.

53.     First, the underlying claims at issue were medically necessary and properly documented.  Dr. Padda provided specific examples depicting the presence of the documentation and support for medical necessity that WPS and CoventBridge claimed were missing.

54.     Second, and perhaps more importantly, the sample size used to determine the overpayment was not representative and did not satisfy due process standards.  *Daytona Beach General Hospital Inc. v. Weiberger*, 435 F.Supp. 891, 901 (M.D. Fla. 1977) (sample size of less than 10 percent of population denied provider due process).  Here, in determining an alleged overpayment of $14,418.93, CoventBridge reviewed approximately 0.1% (only 55 claims out of a universe of 44,580 claims) of the claims submitted by Dr. Padda.  The result of that sample review was then extrapolated over three and a half years' worth of claims to increase the overpayment by 39,934% to $5,964,295.  Third, the defendants' extrapolation methodology is invalid.  Because the sample size at issue here – 0.1% – is too small to ensure procedural fairness and fails to satisfy minimum due process standards, any extrapolation based on that sample is equally invalid.  *Protestant Mem. Med. Ctr. v. Dept. of Public Aid*, 692 N.E.2d 861, 865 (Ill. App. 1998) (sampling method must be valid to use for extrapolation).  Dr. Padda retained an independent statistician, Patricia L. Maykuth, Ph.D. that has been admitted as an expert in similar overpayment matters.  Dr. Padda's statistician prepared a 35-page report highlighting numerous errors in the extrapolation, opining, in part, that the statistical study and extrapolation performed by CoventBridge (and adopted by WPS) was invalid and fatally flawed.  Exhibit 7.  The extrapolation methodology also did not meet the criteria necessary to make inferences from a sample to a larger frame of data and did not comply with Medicare's requirements.

55.     Since 2012, the majority of provider claim denials are overturned on appeal, which shows that the process is fatally flawed.  In 2012, the DHHS Office of Inspector General reported

that providers succeed (fully or partially) at the ALJ level approximately 62% of the time.  Of the remaining appeals, 14% were dismissed, remanded, or escalated, and only 24% were unfavorable to providers.[10]  Between fiscal years 2012 and 2020, on average, less than 30% of appeals were unfavorable to providers.[11]

## DR. PADDA WILL SUFFER IRREPARABLE HARM

56.     Participation in the Medicare program contributes significantly to the financial viability of Dr. Padda's practice and Dr. Padda's ability to provide care to the community. Declaration of Gurpreet S. Padda, M.D. at ¶¶ 15-18, attached as Exhibit 8.

57.     Dr. Padda has already lost 60% of total revenue and numerous patients as a direct result of actions taken thus far by Medicare related to this billing dispute.  *Id.* at ¶15.

58.     Recoupment of $5,964,295 will be detrimental to his medical practice and Dr. Padda will not be able to pay the expenses required to maintain his practice, including the amount needed to cover the payroll for employees.  *Id.* at ¶15-18.

59.     Taking into consideration the amount of money required to maintain his medical practice and pay employees and the amount of money currently available, it is estimated that Dr. Padda will be forced to go out of business within one month, if not immediately, if recoupment of $5,964,295 occurs.  *Id.* at ¶17.

---

[10] *Improvements Are Needed at the Administrative Law Judge Level of Medicare Appeals* (OEI-02-10-00340), at 9 (Nov. 2012), available at https://oig.hhs.gov/oei/reports/oei-02-10-00340.pdf (last visited Dec. 24, 2019).

[11]     U.S. Dept. of Health & Human Serv., *Decision Statistics*, https://www.hhs.gov/about/agencies/omha/about/current-workload/decision-statistics/index.html (last visited March 20, 2021).

60.     Dr. Padda also will face personal financial ruin.  Dr. Padda will be forced to seek bankruptcy protection if recoupment of $5,964,295 occurs, as Dr. Padda does not have the financial ability to pay this amount, in part due to the lost revenue that has already occurred.  *Id.* at ¶18.

61.     Under these circumstances, the administrative appeal provided at 42 C.F.R. § 498.5 does not afford an adequate remedy at law because the recoupment will force his medical practice to close long before an ALJ hearing occurs.

62.     Moreover, the administrative appeal process takes years to exhaust.  In fact, Dr. Padda's administrative appeal will likely take far longer than the 3.9 years currently estimated by OMHA to obtain an ALJ hearing given the annual increases in processing times, let alone the time it will take to receive a decision after any such hearing.[12]  Despite the backlog, recoupment is not stayed pending ALJ appeal.  42 U.S.C. § 1395ddd(f)(2)(A).

63.     If CMS is permitted to recoup $5,964,295 from Dr. Padda during the pendency of the appeal process, the irreparable harm he seeks to avoid will have befallen his business, personal finances, and patients long before any meaningful opportunity for review by an ALJ.

### A BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST SUPPORT GRANTING THE REQUESTED RELIEF

64.     Dr. Padda has no adequate remedy at law and seeks only to preserve the status quo pending the outcome of the administrative appeals process.

65.     Absent relief, Dr. Padda will suffer immeasurable financial harm, will be forced to lay off employees, and patients will lose access to much needed healthcare.

---

[12]     U.S. Dept. of Health & Human Serv., *Average Processing Time by Fiscal Year*, https://www.hhs.gov/about/agencies/omha/about/current-workload/average-processing-time-by-fiscal-year/index.html (last visited March 20, 2021).

66.     CMS, on the other hand, will suffer little, if any, harm because it has the ability to seek recoupment for any overpayment after the ALJ review is complete.

67.     As to the public interest, the issuance of injunctive relief staying the recoupment will permit Dr. Padda to continue practicing medicine in an otherwise underserved area, which in turn will benefit the public.

68.     Defendants should be enjoined from recouping $5,964,295 from Dr. Padda based on a billing dispute in which Dr. Padda is highly likely to prevail, where the Defendants face no harm, where injunctive relief is in the public interest, and where the injunction will prevent Dr. Padda from facing irreparable harm and the forced closure of his medical practice.

69.     Defendants' recoupment constitutes a violation of the APA in that self-help recoupment under the circumstances – where the underlying basis for the overpayment determination is dubious and unlikely to withstand scrutiny by an ALJ, the backlog at the ALJ level will delay hearing for years, and the recoupment will destroy Dr. Padda's medical practice long before the first opportunity at impartial and unbiased review – is arbitrary, capricious, and an abuse of discretion.

70.     Dr. Padda seeks only to preserve the status quo pending exhaustion of the administrative appeal process and a hearing before an ALJ.  To that end, Dr. Padda filed this action for injunctive relief to prevent the Government from recouping $5,964,295 before a decision on the merits of the billing dispute and overpayment determination by an unbiased and impartial ALJ.

**COUNT ONE**
**PROCEDURAL DUE PROCESS**

71.     The allegations contained in paragraphs 1 through 70 above are incorporated by reference as if fully set forth herein.

72.     The process CMS used to determine the alleged $5,964,295 overpayment and for recoupment of that amount is constitutionally inadequate because (i) the individuals performing the review lacked the requisite skill and knowledge to determine medical necessity and are incentivized to inflate any findings and increase their compensation; (ii) the documentation reviewed was insufficient or incomplete, despite Dr. Padda repeatedly providing additional information; (iii) the sample size reviewed – 0.1% – is too low to be representative or to satisfy due process; and (iv) extrapolation of an overpayment amount based on an invalid sample is equally invalid.

73.     To satisfy the requirements of due process, the Secretary must provide Dr. Padda with an administrative hearing and an opportunity to challenge the overpayment determinations before a fair and impartial decision maker ***before*** imposing a self-help recoupment remedy that would force Dr. Padda out of business.  That is especially so here, where Dr. Padda has demonstrated significant reason to doubt the validity of the alleged overpayment determinations underlying the threatened recoupment.

74.     The constitutionally inadequate process by which CMS has improperly and unjustifiably sought recoupment of the alleged overpayment deprives Dr. Padda of ever receiving meaningful relief through the appeals process because the recoupment will devastate Dr. Padda's medical practice long before any hearing on the merits with an ALJ.  Recoupment is not stayed pending ALJ appeal.

75.     At issue are valuable property and liberty rights – Medicare revenue earned and the concomitant ability to treat Medicare beneficiaries; Dr. Padda's legitimate expectation of payment for services provided to Medicare beneficiaries; and Dr. Padda's interest in continuing the practice of medicine, and maintaining his medical practice and the goodwill associated therewith – all of

which are protected by the Due Process Clause of the Fifth Amendment to the United States Constitution.

76.     Defendants have, in essence, deprived Dr. Padda of the property and liberty interests in or associated with Medicare revenue earned without due process of law, in violation of the Fifth Amendment to the United States Constitution and other applicable laws.

77.     The recoupment will cause irreparable harm to Dr. Padda in the form of lost revenues, business closure, and personal financial ruin.

78.     Injunctive relief prohibiting the recoupment until such due process has been granted will not harm the Defendants and is in the public interest.

## COUNT TWO
## SUBSTANTIVE DUE PROCESS

79.     The allegations in paragraphs 1 through 78 above are incorporated as if fully set forth herein.

80.     It is arbitrary, capricious, a clear abuse of discretion, and a violation of the Fifth Amendment to the United States Constitution and other applicable laws for Defendants to recoup alleged overpayment *before* Dr. Padda ever receives an opportunity to exhaust the administrative process when (i) the individuals performing the review lacked the requisite skill and knowledge to determine medical necessity and are incentivized to inflate any findings and increase their compensation; (ii) the documentation reviewed was insufficient or incomplete, despite Dr. Padda repeatedly providing additional information; (iii) the sample size reviewed – 0.1% – is too low to be representative or to satisfy due process; and (iv) extrapolation of an overpayment amount based on an invalid sample is equally invalid.

81.     CMS' conduct in determining and extrapolating the alleged overpayment deprives Dr. Padda of valuable property and liberty rights in the Medicare revenue he earned, the legitimate

expectation of payment for services he provided to Medicare beneficiaries, and the continued operation of his Practice, which are protected by the Due Process Clause of the Fifth Amendment to the United States Constitution.

82.     Defendants' actions will cause irreparable harm to Dr. Padda, his patients, his employees, his medical practice, and his livelihood without due process of law.  The issuance of injunctive relief prohibiting such recoupment will not harm the Defendants and is in the public interest.

**COUNT THREE**
**PRESERVATION OF STATUS OF RIGHTS UNDER THE APA**

83.     The allegations contained in paragraphs 1 through 82 above are incorporated as if fully set forth herein.

84.     In relevant part, the Administrative Procedure Act provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.

85.     This Court is a "reviewing court" and a "court to which a case may be taken on appeal."  42 C.F.R. §§ 498.5(l)(3), 498.90(a)(1).

86.     As outlined above, Dr. Padda has a meritorious challenge to the billing dispute underlying the threatened recoupment and will continue to vigorously assert his arguments during the administrative appeals process currently underway as promptly and expeditiously as the system permits.  In the meantime, if immediate injunctive relief is not granted "to preserve status or rights pending conclusion of the review proceedings," Dr. Padda's right to judicial review in this Court

will be eliminated because the recoupment and subsequent sequelae will cause Dr. Padda's practiceto shut down and will bankrupt Dr. Padda.

87.     Accordingly, pursuant to 5 U.S.C. § 705, issuance of the injunctive relief sought in this case is necessary and appropriate in order to prevent irreparable injury and to preserve the Court's jurisdiction to review the result of the administrative appeal process related to the billing dispute.

## **INJUNCTIVE RELIEF**

88.     The allegations contained in paragraphs 1 through 87 above are incorporated as if fully set forth herein.

89.     Injunctive relief is warranted under the circumstances.

90.     Dr. Padda is highly likely to prevail on the merits of the billing dispute.

91.     Dr. Padda can plainly demonstrate that the underlying claims at issue were medically necessary, properly documented, and appropriately submitted for reimbursement.

92.     Dr. Padda's records adequately reflect that the services at issue were medically necessary, including all required pre-procedural conservative therapies and assessments, and produced a detailed analysis supporting the claims at issue.

93.     Dr. Padda's produced examples, which Dr. Padda provided to WPS and CoventBridge, that evidenced compliance and medical necessity for the services rendered.

94.     The sample size used to determine the overpayment amount – .1% of the universe of claims at issue – was not a representative sample and did not satisfy due process standards. *Daytona Beach General Hospital Inc. v. Weiberger*, 435 F.Supp. 891, 901 (M.D. Fla. 1977) (sample size of less than 10 percent of population denied provider due process).

95.    The extrapolation methodology is invalid because it is based on a 0.1% sample size that is too small to ensure procedural fairness and fails to satisfy minimum due process standards. *Protestant Mem. Med. Ctr. v. Dept. of Public Aid*, 692 N.E.2d 861, 865 (Ill. App. 1998) (sampling method must be valid to use for extrapolation).

96.    The recoupment will cause Dr. Padda to suffer irreparable harm.

97.    If Defendants are permitted to recoup an extrapolated overpayment of $5,964,295 whether immediately or from future Medicare payments, Dr. Padda will not be able to pay the expenses required to maintain his medical practice, including the amount needed to cover the payroll for employees.

98.    Taking into consideration the amount of money required to maintain his medical practice and pay employees and the amount of money currently available, it is estimated that Dr. Padda will be forced to go out of business within one month, if not immediately, if recoupment of $5,964,295 occurs.

99.    Dr. Padda also will face personal financial ruin.  Dr. Padda will be forced to file for bankruptcy protection if recoupment of $5,964,295 occurs, as Dr. Padda does not have the financial ability to pay this amount.

100.   The recoupment and subsequent closure of Dr. Padda's medical practice would not only cause severe and irreparable harm to Dr. Padda and his practice itself but would also harm many of Practice's full-time and part-time employees who would lose their livelihoods.

101.   The threat of irreparable harm to Dr. Padda far outweighs any harm Defendants might suffer if injunctive relief is granted.  In fact, Defendants will not be harmed in any perceptible way by maintaining the status quo.

102.   Granting the requested injunctive relief will not adversely affect the public interest. The public interest is in no way served by an unwarranted and accelerated shut down of a medical practice that devotes a significant portion of its services to federal healthcare program beneficiaries based on a billing dispute.  In fact, the public interest is best served by allowing Dr. Padda to continue treating patients in his community.

103.   Pursuant to Federal Rule of Civil Procedure 65, a temporary restraining order should be issued enjoining Defendants from recouping $14,418.93 or an extrapolated $5,964,295, whether immediately or from future Medicare payments, until such time that a hearing can be held on Dr. Padda's request for a preliminary injunction.

104.   A preliminary injunction should be issued enjoining Defendants from recouping $14,418.93 or an extrapolated $5,964,295, whether immediately or from future Medicare payments, before Dr. Padda has an opportunity to exhaust the administrative appeal process and be heard before an impartial and unbiased ALJ.

WHEREFORE, Dr. Padda prays for the following relief:

a.   A Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65(c) prohibiting the Defendants from recouping the alleged overpayment until such time that a hearing can be held on Dr. Padda's request for a preliminary injunction;

b.   An Order directing Defendants to appear within fourteen (14) days to show cause why said Temporary Restraining Order should not remain in effect as a preliminary injunction pending an ALJ hearing; and

c.   An Order enjoining Defendants from recouping the alleged overpayment until an ALJ has issued a final ruling.

Respectfully submitted this 27th day of April, 2021

/s/ Scott R. Grubman
Scott R. Grubman
317011(GA)
Christian P. Dennis
976485(GA)

CHILIVIS, GRUBMAN, DALBEY & WARNER LLP
3127 Maple Drive
Atlanta, Georgia 30305
(404) 233-4171 (main)
(404) 261-2842 (fax)
sgrubman@cglawfirm.com
cdennise@cglawfirm.com

*Attorneys for the Plaintiffs*

## <u>CERTIFICATION OF COUNSEL</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, undersigned counsel for the plaintiff respectfully certifies to the Court the following with respect to notice to the defendants:

1. On March 29, 2021, undersigned counsel (Christian P. Dennis) made efforts to give notice to Defendants by and through WPS by telephone, to which WPS provided reference number: 210881045.

2. On March 29, 2021 and March 30, 2021, undersigned counsel (Christian P. Dennis) made efforts to give notice to Defendants by and through C2C by telephone.

3. On April 1, 2021, WPS confirmed to undersigned counsel (Christian P. Dennis) that recoupment will begin.  The representative noted that she was unsure whether a percentage or the entire amount would be recouped.  Again, undersigned counsel gave notice of this action and asked the representative to inform necessary parties and to note the file.  Representative provided reference number: 210881045.

4. On April 8, 2021, undersigned counsel (Scott R. Grubman) provided Suzanne Moore, Esq, with a copy of the memorandum of law in support of Dr. Padda's motion for temporary restraining order and preliminary injunction.  Multiple conference calls and email correspondence has occurred regarding the issues giving rise to Dr. Padda's motion for temporary restraining order and preliminary injunction.

Defendants received actual notice and because there is no time to proceed on the basis of further notice and opportunity to be heard, without Dr. Padda suffering irreparable harm, Dr. Padda respectfully submits that no further notice or hearing be required.

<u>*/s/Scott R. Grubman*</u>
Scott R. Grubman
<u>*/s/Christian P. Dennis*</u>
Christian P. Dennis

## **VERIFICATION**

I, Gurpreet Padda, M.D., hereby declare under penalty of perjury that I have read the foregoing Verified Complaint for Injunctive Relief, that the factual statements contained therein are true to the best of my knowledge except those based upon information and belief, as to which I believe such matters to be true.

Executed this __29__ day of March, 2021

_____
Gurpreet Padda, M.D.